IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Libertarian Party of Ohio,
    et al.,                      :

        Plaintiffs,       :

    v.                      :       Case No. 2:13-cv-953

Jon Husted, et al.,       :       JUDGE MICHAEL H. WATSON
                                       Magistrate Judge Kemp
        Defendants.      :

OPINION AND ORDER

    This Opinion and Order is intended to be read in conjunction with the Court's July 30, 2014 Opinion and Order (Doc. 157). The Court will not repeat the factual background contained in that order other than to say that this case involves a challenge to the Ohio Secretary of State's decision upholding a protest to certain nominating petitions filed by Charlie Earl, the Libertarian Party candidate for Governor of Ohio. The protest was filed by Libertarian Party member and Defendant-Intervenor Gregory Felsoci, whose attorneys fees are being paid by someone described by his counsel as the "Unidentified Client." Because the protest succeeded, Mr. Earl is not currently eligible to be listed on the ballot for November's general election as the Libertarian Party's gubernatorial candidate.

    Plaintiffs have filed a motion to compel production of any documents in Mr. Felsoci's possession, custody, or control which would identify the Unidentified Client. In the July 30, 2014 Opinion and Order, the Court listed a number of issues which were not fully addressed by the briefs filed in support of and in opposition to the motion to compel. See Doc. 157, at 12. It directed further consultation among the parties and, if needed, further briefing on those issues. The first two questions the

Court posed - whether there are documents in the possession of Mr. Felsoci's attorneys bearing the name of the Unidentified Client, and whether that person or organization is also a client of Mr. Felsoci's attorneys - have been resolved; the answer to both is "yes."  This Opinion and Order addresses these issues: does Mr. Felsoci have "control," for purposes of Fed.R.Civ.P. 34(a), over any documents showing the name of the Unidentified Client, and, even if he does, would his production of them violate the attorney-client privilege?  For the following reasons, the Court will grant the motion to compel production of at least one document showing the name of the Unidentified Client.

I.  "Control"

Fed.R.Civ.P. 34(a) allows a party to ask for, and requires a party to produce for inspection and copying, documents within the responding party's "possession, custody, or control."  The general principles about when, for Rule 34 purposes, a client has "control" of documents in the possession of a non-party are fairly straightforward.  "Control" is defined as "the legal right or ability to obtain the documents from another source upon demand ...."  Mercy Catholic Medical Center v. Thompson, 380 F.3d 142, 160 (3d Cir. 2004).  Neither physical possession nor legal ownership of the documents is required; "[c]ourts have also 'interpreted Rule 34 to require production if the party has the practical ability to obtain the documents from another, irrespective of his legal entitlement.'"  In re NASDAQ Market-Makers Antitrust Litigation, 169 F.R.D. 493, 530 (S.D.N.Y. 1996), quoting Golden Trade S.r.L. v. Lee Apparel Co., 143 F.R.D. 514, 525 (S.D.N.Y.1992)(although one court has observed that "the 'practical ability' to demand production must be accompanied by a similar ability to enforce compliance with that demand," see Klesch & Co. Ltd. v. Liberty Media Corp., 217 F.R.D. 517, 520

-2-

(D. Colo. 2003)).   Further, "[t]he term control in the context
of discovery is to be broadly construed." New York ex rel.
Boardman v. National R.R. Passenger Corp., 233 F.R.D. 259, 268
(N.D.N.Y. 2006).

An agency theory is one example of the type of relationship
which gives a party - typically the principal - legal control
over documents possessed by the agent. See, e.g., McBryar v.
International Union of United Auto. Aerospace & Agr. Implement
Workers of America, 160 F.R.D. 691 (S.D. Ind. 1993).   An explicit
contractual right is another.   See Ice Corp. v. Hamilton
Sundstrand Corp., 245 F.R.D. 513 (D. Kan. 2007).   Family
relationships, such as between spouses, can also suffice,
especially if the facts show that a party has control over
documents in the possession of a non-party spouse "as a matter of
practical fact."   See Monroe's Estate v. Bottle Rock Power Corp.,
2004 WL 737463, *10 (E.D. La. Apr. 2, 2004).   Attorney-client
relationships are agency relationships, but are also governed by
special rules defining an attorney's ethical duties to the client
(as well as to others), and it would seem logical that the
totality of the legal and ethical rules governing the attorney-
client relationship must be considered when deciding what
documents in the attorney's possession the client has the legal
or practical right to demand.

There may be instances where some factual development is
needed to demonstrate that, even apart from legal ownership or a
legal right to demand documents, a party has the practical
ability to obtain them.   But that is not this case.   Plaintiffs
rely on a legal theory founded on Ohio Rules of Professional
Conduct §1.8(f)(1), which prohibits a lawyer ethically from
accepting compensation for representing a client from someone
other than the client unless "the client gives *informed consent*."
(Emphasis in original).   Informed consent is defined in §1.8(f)

to mean "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." The comment to Rule 1.8(f)(1) states that "[s]ometimes, it will be sufficient for the lawyer to obtain the client's informed consent regarding the fact of the payment and the identity of the third-party payer," but more information may be needed if the situation involves a conflict of interest. This comment suggests that the identity of the third-party payer is a necessary, but not always sufficient, part of the information which must be imparted in order for informed consent to occur. See also Wyoming Lawyer CONFLICTS OF INTEREST: THIRD PARTY PAYERS (December,1998), at *16 ("A client will not likely appreciate the significance of the potential conflict of interest created by having a third party pay unless the lawyer tells the client how the conflict could affect the representation"). It is fair to ask how that could be done if the identity of the person paying the bills is not disclosed.

Following Plaintiffs' reasoning to its logical conclusion, Mr. Felsoci was entitled by a legal rule - Rule 1.8(f)(1) - to be told of the identity of the third-party payer. Accepting as true his statement that he has never been given that information, he would have a legal right to demand some document - perhaps the billing statements sent to the third-party payer for work done as part of the representation of Mr. Felsoci - that would show the identity of that person or organization, and his lawyers would have a corresponding legal duty to provide that document to him. But all of this hinges on whether the ethical rule in question does, in fact, prescribe a legal duty on counsel's part to make that disclosure.

In his argument addressing the issue of control, Mr. Felsoci

-4-

makes no mention of this ethical rule. The cases he cites stand for the more general proposition that the mere fact that an attorney represents multiple clients does not mean that documents relating to one of those clients (and which, under traditional agency principles, only that client would have control over) can be demanded by a different client. While true, that begs the question of whether a legal or ethical rule can alter the situation so that some limited universe of documents created as part of the representation of one client can be demanded by another. Here, for example, it would usually not be the case that a lawyer would have to tell one client about another client's payment of legal fees to the same lawyer; were the two matters involved totally separate, such a disclosure would probably be prohibited. But where the arrangement involves the first client's paying for work done for the benefit of the second client, at least some details of the arrangement must legally be disclosed in order for the representation to be ethically proper. So something not ordinarily required of a lawyer who represents multiple clients may be mandated by rules promulgated to govern the behavior of that lawyer when an atypical arrangement is proposed.

There is certainly precedent for courts to use obligations created by rules of ethics as the basis for judicial action; that is, "[i]n some cases, courts have established rules of law from ethical rules." Bodily v. Intermountain Health Care Corp., 649 F.Supp. 468, 472 (D. Utah 1986), citing United States v. Thomas, 474 F.2d 110 (10th Cir.1973). That includes the District Courts of Ohio. So, for example, in Matter of Investigative Grand Jury Proceedings on April 10, 1979 and Continuing, 480 F.Supp. 162, 168 (N.D. Ohio 1979), the court noted that "[d]ecisions of other courts support the conclusion that joint representation of targets and non-targets constitutes a conflict of interest

warranting remedial judicial action." The source of the duty to avoid such conflicts was, at that time, "the American Bar Association's Code of Professional Responsibility." Id. at 165. Using such ethical rules as the basis for resolving motions to disqualify counsel is now standard practice. See, e.g., SST Castings, Inc. v. Amana Appliances, Inc., 250 F.Supp.2d 863 (S.D. Ohio 2002). And the conflict of interest rules are not the only ones which have led courts to find enforceable legal duties. For example, United States v. Thomas, supra, derived and applied a legal rule from the ethical prohibition against communicating with adverse parties who are known to have counsel in the matter.

Of course, not every ethical rule creates an enforceable legal duty, especially as it relates to persons who are not the attorney's clients; for example, "[a]n ethical duty of disclosure does not create a corresponding legal duty under the federal securities laws" Schatz v. Rosenberg, 943 F.2d 485, 492 (4th Cir. 1991). But generally, because codes of professional responsibility are "recognized as providing appropriate guidelines for the professional conduct of ... lawyers ... the Court has the inherent power to ensure compliance with these standards." United States ex rel. Sheldon Elec. Co., Inc. v. Blackhawk Heating & Plumbing Co., Inc., 423 F.Supp. 486, 488 (S.D.N.Y. 1976). The question then becomes whether this particular ethical rule, mandating informed consent about a situation which carries with it the potential for a conflict of interest, creates an enforceable legal duty owed to Mr. Felsoci, and whether, in order to discharge that duty, his counsel must let him inspect, on demand, at least one document revealing the name of the Unidentified Client.

The Court concludes that Rule 1.8(f)(1) does create an enforceable right. Like the other conflict of interest rules which courts have routinely enforced in the context of motions to

-6-

disqualify, Rule 1.8(f)(1) is designed to insure that "the lawyer's independent professional judgment and the lawyer-client relationship ... be maintained sacrosanct; and no improper disclosures relating or referring to the representation [are] made" to the third-party payer. See In re State Grand Jury Investigation, 200 N.J. 481, 495 (2009). In particular, Rule 1.8(f) recognizes that a third-party payer arrangement can create conflicted duties of loyalty if the interests of the client and the payer ever diverge, and it "impose[s] a duty upon the attorney to represent the sole interests of the client" regardless of who is paying the bills. Barefield v. DPIC Companies, Inc., 215 W.Va. 544, 557-58 (2004). When that does not occur, this rule, like the other conflict rules, has been used as a legal basis for disqualifying counsel. See, e.g., United States v. Fazio, 2011 WL 6140746 (E.D. La. Dec. 9, 2011). It therefore creates enforceable legal duties, and Mr. Felsoci is in a position, as both a legal and practical matter, to demand any information which he needs in order for him to have provided his "informed consent" to the third-party payer arrangement (and counsel, who owe him and not the payer the utmost duty of loyalty in this situation, are legally obligated to give him that information on demand). Further, counsel cannot, without creating an impermissible conflict of interest, withhold information from Mr. Felsoci to which he is entitled on grounds that revealing it would violate a duty of confidentiality owed to the Undisclosed Client; that is not where their duty of loyalty lies in this type of situation.

It might be argued, however, that Mr. Felsoci's informed consent could have been obtained even if he had not been told the identity of the person footing the legal bills for his protest and his litigation activity. However, one primary purpose for that type of disclosure is to allow the client to determine

whether allowing someone else to pay the legal bills will
undermine his attorney's obligation to represent his interests to
the exclusion of the interests of the payer.  It seems impossible
that a client could make an intelligent decision about that issue
if the client is completely unaware of who has offered to pay the
bills.  That payer's motivation, and the nature of the payer's
interest in the issue (which, presumably, is strong enough to
cause it to spend its resources on a legal matter to which it is
not a party - a fairly unusual situation outside of the insurer-
insured or employer-employee relationship) would have to be
communicated in order for the attorney to have provided "adequate
information and explanation about the material risks of ... the
proposed course of conduct," which is the definition of "informed
consent."  The comment to Rule 1.8(f), quoted above, fully
supports this interpretation.  For all of these reasons, the
Court concludes that documents in the physical possession of Mr.
Felsoci's counsel which reveal the identity of the person or
entity paying Mr. Felsoci's legal bills are in Mr. Felsoci's
"control" for purposed of Fed.R.Civ.P. 34(a).

## II.  Privilege

The next question is whether some document containing the
name of the client who is paying the legal bills for Mr. Felsoci,
even if the document is one Mr. Felsoci could demand to inspect,
is protected from further disclosure by the attorney-client
privilege.  In this case, the question of privilege is governed
by federal law.  F.R.E. 501; see also Hancock v. Dodson, 958 F.2d
1367, 1373 (6th Cir. 1992).

The Court begins by stating the general principles governing
the attorney-client privilege.  The primary purpose of the
attorney-client privilege "is to encourage 'full and frank
communication between attorneys and their clients and thereby
promote broader public interests in the observance of law and the

-8-

administration of justice.'" <u>Ross v. City of Memphis</u>, 423 F.3d
596, 600 (6th Cir. 2005) (citations and internal quotations
omitted).  The party asserting the privilege bears the burden of
establishing its existence. <u>United States v. Dakota</u>, 197 F.3d
821, 825 (6th Cir. 1999) (citation omitted).

The privilege protects, among other communications, "the
giving of professional advice to those who can act on it."
<u>Upjohn Co. v. United States</u>, 449 U.S. 383, 390 (1981) (citation
omitted).  Under federal law, the attorney-client privilege
exists when the following elements are met:

> (1) Where legal advice of any kind is sought (2) from a
> professional legal adviser in his capacity as such, (3)
> the communications relating to that purpose, (4) made
> in confidence (5) by the client, (6) are at his
> instance permanently protected (7) from disclosure by
> himself or by the legal adviser, (8) unless the
> protection is waived.

<u>Reed v. Baxter</u>, 134 F.3d 351, 355-56 (6th Cir. 1998) (citations
omitted).

Typically, the identity of a client is not protected by the
attorney-client privilege.  <u>See</u> <u>In re Grand Jury Investigation
No. 83-2-35</u>, 723 F.2d 447, 451 (6th Cir. 1983) ("The federal
forum is unanimously in accord with the general rule that the
identity of a client is, with limited exceptions, not within the
protective ambit of the attorney-client privilege" (citations
omitted)).  Nor is the payment of fees typically protected by the
attorney-client privilege.  <u>United States v. Ritchie</u>, 15 F.3d
592, 602 (6th Cir. 1994) ("virtually every court to consider the
issue has concluded that client identity and payment of fees is
not privileged information") (citation and footnote omitted).

However, there is an exception when "disclosure of the
identity would be tantamount to disclosing an otherwise protected
confidential communication." <u>In re Grand Jury Investigation No.
83-2-35</u>, 723 F.2d at 453.  That exception applies when "'so much

-9-

of the actual communication has already been disclosed that
identification of the client amounts to disclosure of a
confidential communication.'" In re Grand Jury
Proceedings-Gordon, 722 F.2d 303, 307 (6th Cir. 1983) (quoting
NLRB v. Harvey, 349 F.2d 900, 905 (4th Cir. 1965)).  Still,
"[t]he mere 'fact of consultation including the component facts
of ... scope or object of employment' is not privileged." In re
Grand Jury Proceedings-Gordon, 722 F.2d 303, 308 (6th Cir. 1983)
(citing McCormick, Evidence §90 (2d ed. 1972); 2 Weinstein's
Evidence ¶503(a)(4)[02] (1982); Colton v. United States, 306 F.2d
633 (2d Cir. 1962).

These cases, and authority relied on by Mr. Felsoci, such as
NLRB v. Harvey, 349 F.2d 900 (4th Cir. 1965), make it clear that
there must have been some prior disclosure of at least part of a
confidential communication which, if the client were identified,
would then be tied to that client.  Further, as Harvey notes,
"[n]ot all communications to a lawyer are privileged," id. at
904, and both the client's identity and the fact that the client
has retained the lawyer are not ordinarily considered to be
privileged communications even though such communications are
necessary in order for the attorney-client relationship to be
established.  Id. at 905.

Here, Mr. Felsoci has not identified any specific
confidential communications that have been disclosed to which the
Unidentified Client would be linked.  Nor has he identified any
activities engaged in by the Unidentified Client (such as
authorizing counsel to hire a private investigator to gather
information about a particular subject - the circumstances which
led the Harvey court to find the exception applicable) other than
retaining counsel to pay Mr. Felsoci's legal bills.
Consequently, that is the only information that would be revealed
by identifying the Unidentified Client.  As noted, at least in

-10-

this Circuit, neither the subject matter or object of consultation nor the payment of fees are typically considered privileged.  In re Grand Jury Proceedings-Gordon, 722 F.2d at 308; United States v. Ritchie, 15 F.3d at 602.  Thus, it does not appear that the content of any privileged communications would be disclosed were the name of the Unidentified Client to be revealed.

The Gordon decision, which is, of course, controlling here, is especially instructive.  There, the Court of Appeals held that this question posed to an attorney who had incorporated various businesses – "identify the person or persons who requested each incorporation" – did not call for the disclosure of privileged information because identifying the client who asked for those specific legal services to be performed "merely amounts to a disclosure of the scope and objective of the legal employment," and that was not "tantamount to a disclosure of a confidential communication."  Id. at 305, 308.  By disclosing the name of the Unidentified Client, even if that information permits an inference about why that client agreed to finance the ballot challenge in question, nothing more will have occurred in this case than "a disclosure of the scope and objective of the legal employment."  Gordon clearly holds that this type of disclosure is not privileged.

Mr. Felsoci cites to several decisions which, he contends, stand for the proposition that even if identifying the client would not reveal the substance of some specific communication between attorney and client, revealing even the client's _motive_ for seeking legal advice is privileged, and that revealing the identity of the client who is paying for another client's representation necessarily reveals the payer's motive.  In support, he cites, among other cases, In re Grand Jury Subpoena for Attorney Representing Criminal Defendant Reyes-Requena, 926

-11-

F.2d 1423 (5th Cir. 1991), In that case, the court of appeals quashed a subpoena that would have revealed the identity of a criminal defense attorney's client who had agreed to pay for the defense of a different client.  A first subpoena for that information, issued prior to conviction of the second client, was quashed because it might have tied the payer to a drug organization (a problem not present in this case).  A second subpoena, issued after a conviction of the other client was obtained, was then quashed on grounds that the payer's identity was "connected inextricably with a privileged communication — the *confidential purpose* for which [the payer] sought legal advice." (Emphasis supplied).  The same result has been reached in a number of cases where the unnamed client retained an attorney to make an anonymous payment of taxes to the IRS based on the client's conclusion that it underpaid taxes in the past.  See, e.g., Baird v. Koerner, 279 F.2d 623 (9th Cir. 1960).

Here is why the rationale of that Reyes-Requena, which focuses on the possibility that by identifying the client, the lawyer will also disclose the confidential nature of the client's purpose in seeking legal advice, does not apply to the current situation.  First, the Reyes-Requena court made it clear that the attorney-client privilege was implicated by disclosure of the identity of the unnamed client "only if [that disclosure was] intertwined with confidential communications made for the purpose of obtaining legal advice *for the anonymous benefactor*."  Id. at 1432 (emphasis in original).  By contrast, the arrangement in this case seems clearly to have been made for the purpose of providing legal advice and assistance to *Mr. Felsoci* in filing a protest - or, at least, that is the logical inference to draw once the name of the Unidentified Client is disclosed.  The Court notes that in counsel's declaration, see Doc. 159, Exh. A., counsel states that his firm was consulted by the Unidentified

-12-

Client prior to the Firm's agreeing to represent Mr. Felsoci and
that "the confidential client ... is interested in the same
matter and ... has received and is receiving legal advice from
our Firm about it."  Declaration of John W. Zeiger, Esq., ¶3.
That may be so, but the disclosure of that client's identity
would not necessarily have revealed that fact; the client could
have had any number of reasons for agreeing to pay Mr. Felsoci's
legal fees, and counsel cannot, by choosing to make a more
specific disclosure of the purpose of the representation, then
argue that revealing the client's identity would accomplish the
same thing.  Further, there is still no risk that by disclosing
the Unidentified Client's identity, the nature of either any
legal issue created for that client by Mr. Earl's nominating
petitions, or any advice given to the Unidentified Client on that
subject, will be revealed.  Unlike the situation in Reyes-
Requena, the Unidentified Client will not, by being named, be
tied to some criminal wrongdoing, and, unlike the situation in
the taxpayer cases, it will not be linked to prior underpayments
of income taxes which might lead to an IRS audit.  See also Ralls
v. United States, 52 F.3d 223, 226 (9th Cir. 1995), where the
court applied the exception because revealing the client's name
would disclose "that the fee-payer specifically discussed *his or
her own criminal liability* in connection with the same crime for
which [the person whose fees were paid] was charged." (Emphasis
supplied).  In short, there is simply no evidence that the
*substance* of any privileged communications between counsel and
the Unidentified Client about that client's legal interests, if
any, implicated by Mr. Earl's nominating petition will be
revealed if that client is identified.  Further, it cannot be
inferred that the Unidentified Client has communicated with
counsel about the issues involved in Mr. Felsoci's protest; given
that this is not a joint representation, it would not have been

proper for counsel to tell the Unidentified Client about any advice given to Mr. Felsoci on that subject.  The Court therefore concludes that the cases cited by Mr. Felsoci provide no basis for applying the attorney-client privilege to this limited piece of information – and if they do, they must be disregarded as inconsistent with Gordon.

That said, the Court also finds support for its decision in other cases.  For example, in United States v. BDO Seidman, 337 F.3d 802, 812 (7th Cir. 2003), the Court of Appeals for the Seventh Circuit, which had applied the exception relied on by Mr. Felsoci in several earlier decisions, was presented with a case involving the taxpayer-tax adviser privilege which, by statute, see 26 U.S.C. §7525, is to be construed the same way as the attorney-client privilege with respect to communications made during the course of the relationship. The court noted, first, that the exception to the general rule that a client's identity is not privileged is  "narrow" and that it had been applied most often in cases where revealing the client's identity would, given other facts which had already been disclosed, necessarily make clear what the client had communicated to the attorney.  In BDO Seidman, the court recognized that the fact that a taxpayer had consulted his tax adviser about a specific tax-sheltered investment would reveal to the IRS that the client had participated in an investment being investigated by the IRS as abusive, but not what the client may have said to the attorney about that, or what the attorney had advised.  Consequently, the court held that it was "less than clear ... what ... motive or other confidential communication of tax advice, can be inferred from that information [the client's identity] alone."  The simple fact that the taxpayer consulted with an adviser about the tax-sheltered investment was not, in the court's view, likely to shed light on the parties' communications because the IRS knew

-14-

"relatively little about the interactions between [the advisor] and the [taxpayers], the nature of their relationship, or the substance of their conversations." <u>Id</u>. at 811-12.

That situation closely parallels the facts of this case. The public (from whom, it appears, the Unidentified Client wishes to shield its identity) presumably knows very little about any interactions between the Unidentified Client and Mr. Felsoci's lawyers, the nature of any relationship they have, or the substance of any conversations between them – or, at least, there is no proof in this record that any of these matters are widely known.  It is worth noting that the proponent of any privilege has the burden of making a record as to the facts pertinent to the Court's enforcement of that privilege.  <u>See In re Grand Jury Investigation No. 83-2-35</u>, 723 F.2d at 450 ("[t]he burden of establishing the existence of the privilege rests with the person asserting it").  Without evidence identifying a specific portion of a specific confidential communication which has already been disclosed, and to which the Unidentified Client could be linked if its identity were made known, it is impossible to conclude that this case falls within the narrow exception represented by decisions like <u>Reyes-Requena,</u> <u>supra</u>, <u>Harvey</u>, <u>supra</u>, or cases cited by the <u>BDO Seidman</u> decision such as <u>Tillotson v. Boughner</u>, 350 F.2d 663 (7th Cir. 1965) and <u>In re Grand Jury Proceeding (Cherney)</u>, 898 F.2d 565, 567 (7th Cir.1990).  And this is clearly not a case like <u>Medtronic Sofamor Danek, Inc. v. Michelson</u>, Case No. 01-2373, at 9 (W.D. Tenn. Nov. 6, 2003) (cited by Mr. Felsoci, <u>see</u> Doc. 159-2), where the clients (whose identities were already known) were jointly represented by the same attorney, the discovery request was not for their identities but the fee arrangements they made with counsel, and disclosure of that information, communicated in the course of a joint representation – something expressly disclaimed by Mr. Felsoci's

counsel - would "reflect confidential communications, such as the monetary exposure of each defendant, the chance of recovery for each party, the chance of success for each party, and the validity of claims and defenses."  No such matters would be revealed following the disclosure of the identity of the Unidentified Client in this case.

### III.  <u>Summary of Analysis</u>

The Court concludes, for the reasons stated above, that the rule rather than the exception applies here.  In almost every situation where one person pays the legal fees of another, the fact of that arrangement is fair game for disclosure and no privilege to withhold that fact exists.  So, for example, when a plaintiff sought disqualification of attorneys who represented both PetSmart and four of its employees under an agreement which obligated PetSmart to pay all of the legal fees, the court noted that the plaintiff had not "shown that the confidential information of the employees or of PetSmart has been compromised" even though the fact of the payment arrangement and the identity of the payer were disclosed.  <u>See Perez v. PetSmart, Inc.</u>, 2011 WL 4026910, *5 (E.D.N.Y. Sept. 12, 2011).  There, the parties had a joint interest in defending themselves against litigation, something not typically deemed confidential.  Here, Mr. Felsoci and his counsel have stated that Mr. Felsoci and the Unidentified Client share "an interest in ensuring the integrity of Ohio's election process ...."  <u>See</u> Doc. 159, at 3.  That is, ordinarily, a matter not deemed to be confidential; it is something to which every good citizen should aspire.  There is no evidence that any communication of any kind between the Unidentified Client and counsel will be revealed simply because its identity is disclosed; beyond knowing the simple fact that the Unidentified Client agreed to pay Mr. Felsoci's legal bills, the identity of that client cannot be tied to any communications made in

-16-

confidence between that client and its attorneys.

True, revealing the identity of the Unidentified Client allows the public to infer that the client stated to counsel, "I will pay Mr. Felsoci's legal fees if he files a protest," or words to that effect. But if that one statement is deemed privileged, the identity of a third-party payer (who, presumably, always makes that type of statement) could never be disclosed. That is just not the law. Consequently, since Mr. Felsoci, to the extent that he has not otherwise been told who the Unidentified Client is who has agreed to pay his legal fees, has an enforceable right to demand a document showing that person or organization's identity, and because such information is not privileged, the Court will grant the motion to compel.

### IV. Conclusion and Order

For the foregoing reasons, the motion to compel concerning Defendant-Intervenor Gregory Felsoci (Doc. 130) is granted. Within three business days, Mr. Felsoci shall produce at least one document responsive to the request which asks for documents revealing the name of the "Unidentified Client." In doing so, he shall insure that the document is properly redacted of any information which might disclose communications between his attorneys and the Unidentified Client except for the fact that the Unidentified Client is being billed for services rendered to Mr. Felsoci.

### V. Motion for Reconsideration

**Given the time-sensitive nature of this matter, these times are being shortened substantially.**

Any party may, within **three** days after this Order is filed, file and serve on the opposing party a motion for reconsideration by a District Judge. 28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P.; Eastern Division Order No. 14-01, pt. IV(C)(3)(a). The motion must specifically designate the order or part in

-17-

question and the basis for any objection.  Responses to objections are due **three** days after objections are filed and replies by the objecting party are due **two** days thereafter.  The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

This order is in full force and effect even if a motion for reconsideration has been filed unless it is stayed by either the Magistrate Judge or District Judge.  S.D. Ohio L.R. 72.3.

/s/ Terence P. Kemp
United States Magistrate Judge